TIP TOP FARMS, INC., Appellant-Respondent, v DAIRYLEA COOPERATIVE, INC., Respondent-Appellant. (Action No. 1.)

PARK LANE DAIRIES, INC., et al., Appellants-Respondents, v DAIRYLEA COOPERATIVE, INC., Respondent-Appellant. (Action No. 2.)

JEROME DAIRY CO., INC., Appellant-Respondent, v DAIRYLEA COOPERATIVE, INC., Respondent-Appellant. (Action No. 3.)

Second Department, December 30, 1985

14

**APPEARANCES OF COUNSEL**

*Marcus & Katz (Lawrence K. Katz* of counsel), for Tip Top Farms, Inc. and another, appellants-respondents.

*Field, Lomenzo & Turret, P. C. (David A. Field* and *Burt Kesselman* of counsel), for Park Lane Dairies, Inc. and another, appellants-respondents.

*Bond, Schoeneck & King (John M. Freyer, Ronald C. Berger* and *Janet H. Bliss* of counsel), for Dairylea Cooperative, Inc., respondent-appellant.

**OPINION OF THE COURT**

RUBIN, J.

The common issue for appellate review in these three appeals is whether Federal antitrust policies bar indirect purchasers from obtaining, in an action to recover damages for a breach of contract or for money had and received, so much of a direct purchaser's recovery fund in a Federal antitrust action as represents illegal overcharges that had been passed on to the indirect purchasers pursuant to cost-plus pricing provisions in their requirements contracts with the direct purchaser.

Defendant Dairylea Cooperative, Inc. operates a milk pasteurizing plant in Queens County where it pasteurizes and packages milk and milk by-products for itself and other dealers. The plaintiffs are licensed milk dealers, who sell milk at wholesale in various counties in the metropolitan area.

Tip Top Farms, Inc. (Tip Top), the plaintiff in action No. 1, alleges that defendant processed all its requirements for milk and milk products in 1973 and 1974 pursuant to an oral agreement which the parties entered into in October 1973. According to Tip Top, defendant agreed to supply it with all its requirements for packaged milk and milk products in exchange for a price that was based on three components: (1) the monthly price for raw milk established by the Federal Milk Market Administrator; (2) a charge for processing the raw milk, generally negotiated in the spring and fall of each year; and (3) defendant's cost for fiberboard milk cartons plus 1% as an allowance for plant loss. The parties allegedly agreed that defendant's profit was to be solely derived from the cost of processing the raw milk. Pursuant to said agreement, defendant issued monthly announcements notifying Tip Top of all increases or decreases in the cost of milk, the cost of

processing and the current cost for cartons. Tip Top would order from defendant all its requirements for packaged milk and milk by-products. Tip Top's requirements varied, and the agreement did not obligate it to purchase a fixed quantity. Furthermore, Tip Top alleges that the agreement was terminable at will by either party.

Plaintiffs in action No. 2, Park Lane Dairies, Inc. (Park Lane) and Park Dale Dairies, Inc. (Park Dale) allege that they entered into a similar oral contract with defendant in 1969, and, pursuant to said agreement, they purchased all their requirements for packaged milk and milk products from defendant in the years 1971 through 1974. Plaintiff in action No. 3, Jerome Dairy Co., Inc. (Jerome Dairy) also alleges that it entered into a similar oral agreement with defendant in December 1967, and that it purchased all its requirements for packaged milk and by-products from defendant during 1971 and 1974 in accordance with said agreement.

In approximately 1976, a Federal antitrust action was commenced against several manufacturers of fiberboard products. In violation of the Clayton Act (15 USC § 15), said manufacturers had allegedly conspired to fix prices and to allocate customers, resulting in illegal overcharges for their products, such as milk cartons, during the years 1960 to 1974. The United States District Court for the Northern District of Illinois certified a class which included direct purchasers from the manufacturer but excluded indirect purchasers further down in the chain of distribution (see, In re Folding Carton Antitrust Litigation, 75 FRD 727). In 1979, the antitrust action was settled. The manufacturers, without admitting any liability, agreed to contribute to a settlement fund exceeding $200,000,000. Since Dairylea was a direct purchaser, it was included as a member of the plaintiff class in the antitrust action, and was notified in 1979 that it could submit a claim indicating its total purchases of fiberboard products from the defendant manufacturer during any four years between 1960 and 1974. Dairylea filed a claim based on its purchases of fiberboard products from defendant manufacturers during the years 1971 through 1974. Dairylea's claim was approved to the extent of $20,606,000. In April 1980, Dairylea received its proportionate share of the settlement fund in the form of $1,165,981.52 in cash, $29,100 in noninterest bearing promissory notes and a stock warrant entitling it to purchase 291 shares of Federal Paper Board Company, Inc.

Thereafter, plaintiffs commenced the instant actions in an

attempt to recover a portion of the funds defendant Dairylea received in settlement of the antitrust action on a theory of breach of contract and on a theory of money had and received. Since Dairylea had passed on the milk carton manufacturer's overcharge to plaintiffs during the period of 1971 through 1974 by charging them, pursuant to their respective requirements agreements, the cost of the cartons plus 1%, plaintiffs reasoned that a portion of the proceeds of the antitrust settlement received by Dairylea represented a reduction of the cost of milk cartons which they purchased from Dairylea during that period. Therefore, plaintiffs contended that Dairylea was contractually obligated under the cost-plus provision of their oral contracts to refund said amount to them.

■ Special Term granted those branches of defendant's motions which requested summary judgment dismissing the causes of action in plaintiffs' respective complaints which sought to recover, on either a breach of contract or money had and received theory, the proceeds defendant received in settlement of the antitrust litigation on the ground that recovery would undermine overriding Federal antitrust policies. We agree with Special Term.

### ILLINOIS BRICK RULE AND POLICY CONSIDERATIONS

Clayton Act § 4 (15 USC § 15) provides that any person "who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained". In *Illinois Brick Co. v Illinois* (431 US 720, *reh denied* 434 US 881), the United States Supreme Court held that, aside from two narrow exceptions, an indirect purchaser had no cause of action against the manufacturer under Clayton Act § 4 to recover treble damages for an illegal overcharge on the theory that the overcharge had been passed on to the indirect purchaser by the direct purchaser in the distribution chain.

In so holding, the Supreme Court echoed the policy considerations it had expressed nine years earlier in *Hanover Shoe v United Shoe Mach.* (392 US 481), when it ruled that an antitrust defendant could not assert as a defense to a claim for treble damages under Clayton Act § 4, that the plaintiff, a direct purchaser, had "passed on" the overcharge to a buyer further down in the chain of distribution, and, thus, had not sustained real economic injury.

One policy consideration voiced by the Supreme Court in *Hanover Shoe (supra,* p 493) as warranting a bar to the assertion of "pass-on" defense was the "massive evidence and complicated [economic] theories" that would be injected into the litigation to prove the amount of the overcharge, if any, that was passed on. As noted by the *Hanover Shoe* court: "A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable" *(Hanover Shoe v United Shoe Mach., supra,* at pp 492-493). The *Illinois Brick* court recognized that the same insurmountable evidentiary problems of tracing the effect of an overcharge on prices, sales, costs and profits would apply a fortiori to a case where passing on was used offensively *(Illinois Brick Co. v Illinois, supra,* at p 741) and "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers" *(Illinois Brick Co. v Illinois, supra,* at p 737). The burdens that such attempts would impose on the effective enforcement of the antitrust laws gave rise to the second policy concern voiced by the United States Supreme Court in rejecting the use of pass-on theories to enable indirect purchasers to bring antitrust actions to recover treble damages for illegal overcharges absorbed by them.

Cognizant of the long-standing policy of encouraging vigorous private enforcement of the antitrust law *(see, e.g., Perma Mufflers v International Parts Corp.,* 392 US 134, 139), the Supreme Court was of the opinion that both the defensive and offensive use of the "pass on" concept would "seriously undermine" the effectiveness of such suits *(Illinois Brick Co. v Illinois, supra,* at p 737): "The concern in *Hanover Shoe* for the complexity that would be introduced into treble-damages suits if pass-on theories were permitted was closely related to the Court's concern for the reduction in the effectiveness of those suits if brought by indirect purchasers with a small stake in the outcome than that of direct purchasers suing for the full amount of the overcharge. The apportionment of the recovery throughout the distribution chain would increase the overall costs of recovery by injecting extremely complex issues into the case; at the same time such an apportionment would reduce the benefits to each plaintiff by dividing the potential recovery among a much larger group. Added to the uncertainty of how much of an overcharge could be established at trial would be the uncertainty of how that overcharge would be apportioned among the various plaintiffs. This additional uncertainty would further reduce the incentive to sue. The combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement" *(Illinois Brick Co. v Illinois, supra,* at p 745). Consequently, the *Hanover Shoe-Illinois Brick* rule is predicated in part on the perceived need to concentrate the recovery for illegal overcharges in direct purchasers in order to guarantee that there would be one group with an incentive to sue and enforce the antitrust laws *(see, Mid-West Paper Prods. Co. v Continental Group,* 596 F2d 573, 577-578, n 9, 580, n 24).

Lastly, in *Illinois Brick (supra),* the Supreme Court noted that if passing on were allowed offensively, but not defensively, antitrust defendants would face a serious risk of multiple liability. For example, if an indirect purchaser recovered treble damages for the percentage of the overcharge that had been passed on to him, the direct purchaser could still recover treble damages for the full amount of the overcharge because the defendant under the *Hanover Shoe* doctrine would not be allowed to assert pass-on of the overcharge as a defense. Consequently, unequal application of the pass-on concept would substantially increase the possibility of subjecting a

defendant to inconsistent adjudications *(Illinois Brick Co. v Illinois, supra,* at p 730).

In the instant case, unless plaintiffs fall within one of the circumscribed exceptions to the *Illinois Brick* rule, they cannot directly sue the manufacturers of fiberboard cartons to recover the overcharge which Dairylea had passed on to them pursuant to the cost-plus provision of their oral requirements contracts. Nor can plaintiffs recover said amount by suing Dairylea for a violation of the antitrust law merely because Dairylea has passed on the illegal overcharge, unless plaintiffs can show a conspiracy between the manufacturers and Dairylea to fix wholsesale prices *(see, Reiter v Sonotone Corp.,* 486 F Supp 115; *Albrecht v Herald Co.,* 390 US 145, *reh denied* 390 US 1018; *Dr. Miles Med. Co. v Park & Sons Co.,* 220 US 373; *see also, State of New York v Dairylea Coop.,* 570 F Supp 1213, 1215-1216; Dunfee, *Privity in Antitrust: Illinois Brick v Illinois,* 16 Am Bus LJ 107, 115, n 42). We note that the complaints do not allege such a conspiracy.

The two potential exceptions to the *Illinois Brick* holding are based on the elimination of the evidentiary complexities and uncertainties which arise in tracing the interaction of market forces in order to prove the amount of the overcharge that had been passed on through the distribution chain.

One exception permits an indirect purchaser to sue for treble damages when there is a "pre-existing, fixed-quantity, cost-plus contract" between the direct purchaser and the indirect purchaser *(Mid-West Paper Prods. Co. v Continental Group,* 596 F2d 573, 577, *supra),* because the "effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case" *(Illinois Brick Co. v Illinois,* 431 US 720, 736, *supra).* In a market where demand is perfectly inelastic (unresponsive to changes in price) the indirect purchaser absorbs the entire overcharge; where demand is perfectly elastic (responsive to changes in price) the direct purchaser absorbs it. In all intermediate cases, the overcharge is apportioned between them *(see generally,* Comment, *A Legal and Economic Analysis of the Cost-Plus Contract Exception in Hanover Shoe and Illinois Brick,* 47 U Chi L Rev 743, 746; Schaefer, *Passing-On Theory in*

*Antitrust Treble Damage Actions: An Economic and Legal Analysis,* 16 Wm & Mary L Rev 883).* Under a cost-plus contract, a product is sold at a specified markup above the seller's own cost. An illegal overcharge is another of the direct purchaser's costs, which the indirect purchaser is committed to pay. Where the cost-plus contract is for a fixed amount, the indirect purchaser's demand for the product is completely inelastic because the indirect purchasers must buy the same quantity at the direct purchaser's price even though the price may vary with the direct purchaser's cost *(see, Lefrak v Arabian Am. Oil Co.,* 487 F Supp 808, 819; Schaefer, *Passing-On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis,* 16 Wm & Mary L Rev 883, 892). Moreover, "the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer [indirect purchaser] is committed to buying a fixed quantity regardless of price" *(Illinois Brick Co. v Illinois, supra,* at p 736). Since a preexisting fixed quantity, cost-plus contract renders the indirect purchaser's demand for the product perfectly inelastic, resort to tracing the interaction of market forces is unnecessary to prove the indirect purchaser has absorbed the illegal overcharge in its entirety. However, "where a fixed quantity does not exist, and an indirect purchaser is free to vary the amount of its purchases in response to price changes, the evidentiary problems incident to allocating the amount of the overcharges arise" *(Lefrak v Arabian Am. Oil Co., supra,* at p 819).

The clear dictate of *Illinois Brick (supra)* is that the cost-plus contract exception is to be narrowly construed *(see, Mid-West Paper Prods. Co. v Continental Group, supra,* at p 577, n 9; *Lefrak v Arabian Am. Oil Co., supra,* at p 818). A primary feature of the cost-plus contract which led the Supreme Court to cite this as a possible exception to *Illinois Brick* is a "commitment for a fixed quantity, precluding evidentiary complexities due to considerations of decreasing sales" *(International Assn. of Machinists & Aerospace Workers v Organization of Petroleum Exporting Countries,* 477 F Supp 553, 562, *affd* 649 F2d 1354, *cert denied* 454 US 1163). Consequently, an

---

* A similar analysis applies when supply is either perfectly elastic or perfectly inelastic, except that perfect inelasticity results in the direct purchaser absorbing the entire overcharge, while perfect elasticity places the overcharge on the indirect purchaser *(see,* Schaefer, *Passing-On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis,* 16 Wm & Mary L Rev 883, 887-897).

indirect purchaser's informal week-to-week arrangements to buy varying quantities on a cost-plus basis *(see, Mid-West Paper Prods. Co. v Continental Group, supra,* at pp 577-578, n 9) and a requirements contract indexed to the distributor's cost *(see, Lefrak v Arabian Am. Oil Co., supra)* have been held insufficient to invoke this exception to *Illinois Brick* because there is no commitment to purchase a fixed quantity. Similarly, in the instant case, the alleged requirements contracts are not encompassed within this exception to *Illinois Brick* because plaintiffs admit that they were not obligated to buy a fixed quantity. Moreover, according to plaintiffs, the contracts were terminable at will.

To demonstrate that the subject requirements contracts are not the functional equivalent of the cost-plus contract contemplated by this exception to *Illinois Brick (supra),* it bears repeating that the direct purchaser will be able to shift a larger share of any overcharge imposed on him onto the indirect purchaser in a market where demand is more inelastic and the supply is more elastic. Conversely, the more elastic the demand and the more inelastic the supply, the greater the share of an overcharge the direct purchaser must bear himself (Comment, *A Legal and Economic Analysis of the Cost-Plus Contract Exception in Hanover Shoe and Illinois Brick,* 47 U Chi L Rev 743, 746). Because Dairylea's product, packaged milk, is perishable, the supply is highly inelastic. Since there are some acceptable substitutes for packaged milk products and plaintiffs are not obligated to purchase a fixed amount from Dairylea, the plaintiffs' (wholesalers'), the retailers', and the ultimate consumers' demand for Dairylea's product is, to some extent, elastic. Consequently, in the usual market, the overcharge for milk cartons will be partially borne by both Dairylea and plaintiffs. How much of the overcharge Dairylea shifted onto plaintiffs and how much it absorbed, as evidenced by a loss in actual or potential sales volume or by adjustments in its charge for pasteurization, depended on the relative elasticities of supply and demand. Accordingly, any attempt to fit the subject requirements contract into the *Illinois Brick* cost-plus contract exception is misplaced because allocating the amount of the illegal overcharge for milk cartons which Dairylea passed on to plaintiffs cannot be ascertained without reference to complex market interactions of supply and demand.

A second exception to the *Illinois Brick* rule is a situation where "market forces have been superseded" because "the

direct purchaser is owned or controlled by its customers" *(Illinois Brick Co. v Illinois,* 431 US 720, 736, n 16, *supra).* Although Park Lane and Park Dale argue, for the first time on appeal, that Dairylea was their "purchasing agent" for milk cartons, there is nothing in the record to suggest that the relationship between plaintiffs and defendant was anything more than that of vendor and vendee. Each acted independently and made contract and pricing decisions according to its individual concerns. Primary characteristics of an agent-principal relationship are that the agent is placed in a position to affect or alter the legal relations between the principal and third parties in matters within the scope of the agency and that the principal has the right to control the conduct of the agent with respect to matters entrusted to it *(see, Smirlock Realty Corp. v Title Guar. Co.,* 70 AD2d 455, 464). Such is clearly not the situation at bar.

The principle that plaintiffs " 'may not alter a remedy which exists solely by virtue of a statute is * * * too well settled to require citation of authority' " *(see, Russo & Dubin v Allied Maintenance Corp.,* 95 Misc 2d 344, 348, quoting from *Sun Theatre Corp. v RKO Radio Pictures,* 213 F2d 284, 287). Here, plaintiffs seek to recover indirectly what they cannot recover directly. Since plaintiffs were barred in a Federal antitrust action against the manufacturers from recovering treble the amount of the illegal overcharge for milk cartons that had been passed on to them, they now seek, in the guise of an action to recover damages for breach of contract and for money had and received, to recover the same damages in State court from a direct purchaser, who was allowed to recover the overcharge at issue in the Federal action. While such a suit would not expose the defendant manufacturers in the Federal antitrust action to multiple liability, to allow the indirect purchaser to recover from the direct purchaser the amount of the illegal overcharges that had been passed on to it, pursuant to a cost-plus requirements contract that did not fall within an exception to the *Illinois Brick* rule, would severely impair the private enforcement of the Federal antitrust laws.

### EFFECT OF THIS SUIT ON ENFORCEMENT OF FEDERAL ANTITRUST LAWS

A major policy consideration in concentrating the full recovery for an illegal overcharge in the direct purchaser, rather

than allowing every indirect purchaser potentially affected by the overcharge to sue only for the amount it could show was absorbed by it, is to ensure that a group of private Attorneys General will be available to deprive antitrust violators of the fruits of their illegality.

Private antitrust enforcement has two objectives: to compensate victims of antitrust violations *(e.g., Brunswick Corp. v Pueblo Bowl-O-Mat,* 429 US 477, 485-486) and to deter the commission of such violations *(see, Hanover Shoe v United Shoe Mach.,* 392 US 481, 494, *supra; Sun Theatre Corp. v RKO Radio Pictures,* 213 F2d 284, 287, *supra; Illinois Brick Co. v Illinois, supra).* In elevating direct purchasers to a preferred position as private Attorneys General, the United States Supreme Court was aware that the *Illinois Brick* rule would, on occasion, create a windfall for the direct purchaser, who was able to recoup his economic loss in the marketplace by passing on the overcharge to its customers in the form of increased prices, and would fail to compensate those indirect purchasers who may have been actually injured by antitrust violations. Nevertheless, in the *Illinois Brick* court's view, in order to ensure effective enforcement of the antitrust laws, deterrence was the preferred objective.

The most important consideration from the standpoint of deterrence is not who receives the proceeds of any judgment levied against the antitrust violator *(see, Illinois Brick Co. v Illinois, supra,* at p 760 [Brennan, J.'s dissent]), but that there exists adequate incentives to bring an antitrust suit and prosecute it to judgment *(see also,* Landes & Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick,* 46 U Chi L Rev 602, 608). The *Illinois Brick* rule was purposely designed to give the direct purchaser the maximum incentive to sue by allowing direct purchasers to recover treble the entire overcharge without subtracting the amount of that overcharge passed on to more remote purchasers.

In establishing standing rules which favored direct purchasers over indirect purchasers, the *Illinois Brick* court acknowledged that "direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers" *(Illinois Brick Co. v Illinois, supra,* at p 746). Several other courts and commentators have also recognized that a direct purchaser may not be hurt very much as a result of passing on an overcharge and, thus, may not wish to risk the breach of a long-standing supplier relationship for the

chancy potential recovery of windfall damages *(see, e.g., In re Western Liquid Asphalt Cases,* 487 F2d 191, 198, *cert denied sub nom. Standard Oil Co. v Alaska,* 415 US 919; *Boshes v General Motors Corp.,* 59 FRD 589, 598 [ND Ill 1973]; Dunfee, *Privity in Antitrust: Illinois Brick v Illinois,* 16 Am Bus LJ 107, 114; Schaefer, *Passing-On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis,* 16 Wm & Mary L Rev 883, 913-914; Wheeler, *Antitrust Treble-Damage Actions: Do They Work?,* 61 Cal L Rev 1319, 1325; Note, *The Effect of Hanover Shoe on the Offensive Use of the Passing-On Doctrine,* 46 S Cal L Rev 98, 112; Harrison, *Illinois Brick: The Death Knell of Ultimate Consumer Antitrust Suits,* 52 St. John's L Rev 421, 453). In view of the fact the *Illinois Brick* rule allows only direct purchasers to recover damages for antitrust violations, it is our opinion that enforcement of Federal antitrust laws would be seriously impaired if the direct purchaser's incentive to bring an antitrust suit is reduced further by the prospect of having to defend his recovery fund against claims from its customers in a State action such as the one at bar. A direct purchaser confronted with the prospect of having to defend its recovery fund against the claims of its customers merely because the illegal overcharge had been passed on to its customers by reason of a cost-plus provision in a requirements contract may readily find the role of private Attorney General too burdensome to warrant the massive expenditure of time and money. The conclusion that such a suit necessarily weakens—and at the extreme eliminates—the incentive of the direct purchaser to act as a private Attorney General is derived from two economic observations. First, in the absence of a preexisting, fixed quantity, cost-plus contract or an indirect purchaser's ownership or control of the direct purchaser, the problem of apportioning damages among direct and indirect purchasers would be costly, due to the litigation expenses and complex evidentiary problems entailed in proving the amount of the overcharge that had been passed on to the indirect purchaser. Second, even if allocation problems could be solved without seriously depleting the recovery pool, after the recovery is divided among the direct purchaser's customers, the amount of damages, if any, the direct purchaser is allowed to retain would be relatively small *(see,* Landes & Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick,* 46 U Chi L Rev 602, 608-615). The net effect is to significantly

impair the direct purchaser's incentive to institute or prosecute a Federal antitrust action against his supplier or to file a claim in a pending class action for treble damages.

Furthermore, where a multitiered distribution system exists, as in this case, we note that indirect purchasers (plaintiffs, the milk wholesalers), like the direct purchaser (Dairylea, the pasteurizer), will often be able to pass on much of the cost of an unlawful price increase (illegal overcharge for milk cartons) to their customers (the retailers), who, in turn, will pass it on to the ultimate consumer. Thus, allowing indirect purchasers (plaintiffs, the wholesalers) to recover from the direct purchaser the amount of the overcharge passed on to them may not substantially further the compensatory objective of the Federal antitrust laws *(see,* Landes & Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick,* 46 U Chi L Rev 602, 608), whereas it may substantially impair the deterrence objective by reducing the recovery fund of the direct purchaser and correspondingly the latter's incentive to act as a private Attorney General.

In the instant case, plaintiffs, under the *Illinois Brick* rule, had no legal or equitable interest in the Federal antitrust settlement fund. Plaintiffs concede that Dairylea never specifically agreed to reimburse them for any illegal overcharge in the cost of milk cartons that had been passed along to them in the event Dairylea recovered the overcharges in a Federal antitrust action against the milk carton manufacturers. A contrary allegation is belied by the fact that the parties' requirements agreements were made years before a class action on behalf of direct purchasers to recover treble damages under the Clayton Act § 4 was commenced against several manufacturers of fiberboard products and years before Dairylea filed a claim as a member of the class. Moreover, when defendant received its share of the settlement fund, plaintiff Jerome Dairy had ceased doing business. Therefore, this is not a situation involving a contract where the parties specifically agreed to distribute the proceeds of a contemplated antitrust judgment. In the latter case, the direct purchaser, in entering into such an agreement, would arguably have received some form of consideration to furnish it with the requisite incentive to file an antitrust claim, even if it took the form of an increase in the direct purchaser's good will. Here, based merely on the nature of a cost-plus pricing provision, plaintiffs plead an implied promise by Dairylea to

pass along reductions in the cost of milk cartons, including funds it recovered in a Federal antitrust action for illegal overcharges that had been passed on to plaintiffs pursuant to the same cost-plus pricing provision. The artful pleading is an attempt to circumvent the *Illinois Brick* rule.

To reiterate, allowing plaintiffs to bring an action either for breach of contract or for money had and received against Dairylea for the purpose of recovering the amount of an illegal overcharge Dairylea passed on to them because their respective requirements contracts contained a cost-plus pricing provision, when said remedy is foreclosed by direct suit against the antitrust violator, would undermine effective enforcement of the Federal antitrust laws by substantially impairing the direct purchaser's incentive to act as private Attorney General. Accordingly, to the extent the cost-plus pricing provision in the subject requirements contracts could be construed as an implied promise by Dairylea to remit to plaintiffs any portion of its antitrust settlement fund, as a purported reduction in the cost of milk cartons, it is violative of Federal antitrust policy. Consequently, Special Term correctly granted defendant's motion for summary judgment, dismissing plaintiff Tip Top's complaint, insofar as it seeks to recover the proceeds Dairylea received in settlement of the antitrust litigation, and dismissing the other plaintiffs' complaints in their entirety.

■ ■ Two other issues must be briefly addressed. First, plaintiff Tip Top's complaint pleads an additional cause of action not alleged in the other plaintiffs' complaints. Tip Top alleges that from 1978 to 1980, Dairylea received discounts from the manufacturers of fiberboard cartons based on the volume of its purchases. Tip Top asserts that Dairylea breached the cost-plus provision of their agreement by failing to pass along the volume discounts received by Dairylea for the milk cartons Dairylea sold to Tip Top. With respect to this claim, Special Term correctly denied summary judgment because a factual issue exists as to the meaning of the cost-plus provision, i.e., whether defendant was to sell milk cartons to Tip Top at its current or its final cost. Second, defendant's motion to amend its answers to assert the Statute of Frauds defense was properly denied for reasons stated in the opinion of our learned brother Justice Lazer. As noted by Justice Lazer, Uniform Commercial Code § 2-201 (1) is inapplicable because the milk cartons had already been delivered, accepted and paid for pursuant to the parties' oral agreements and

General Obligations Law § 5-701 (a) (1) is inapplicable because the subject agreements were capable of performance within one year.

Accordingly, the orders appealed from should be affirmed.

LAZER, J. P. (concurring in part and dissenting in part). I disagree with my colleagues' view that the dispositive issue on this appeal is whether the contract alleged by the plaintiffs falls within one of the exceptions to the rule in *Illinois Brick Co. v Illinois* (431 US 720). The issue is much broader, for it concerns the relationship between Federal antitrust policies and access to the State courts for the purpose of common-law actions. More specifically, however, we must determine whether the policies enunciated in *Illinois Brick* preclude an indirect purchaser of goods from bringing a State common-law action against the direct purchaser to recover damages for breach of contract or moneys had and received when the purpose of the action is recovery of a portion of the sums the direct purchaser received as a result of an antitrust suit against the manufacturer. Because I believe that *Illinois Brick* does not preclude State courts from adjudicating common-law contract disputes, I dissent insofar as I would modify the orders of Special Term by denying those branches of defendant's motions which were for summary judgment dismissing plaintiffs' claims to a share of defendant's antitrust settlement. I agree, however, that Special Term's denial of leave to amend defendant's answers and plaintiffs' cross motions for partial summary judgment should be affirmed.

## I

In *Illinois Brick Co. v Illinois (supra),* the Supreme Court held that with certain limited exceptions an indirect purchaser of goods is not an injured person within the scope of the Clayton Act § 4 (15 USC § 15) and thus cannot sue the manufacturer of those goods for Federal antitrust violations. The principal reason enunciated by the court for its decision to so narrowly construe the Federal statute was its fear that a contrary decision "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers" *(Illinois Brick Co. v Illinois, supra,* at p 737). This, the Supreme Court believed, would "add whole new dimensions of complexity to treble-damages suits and seriously

undermine their effectiveness" *(Illinois Brick Co. v Illinois, supra,* at p 737). Additionally, the court expressed its concern that to allow theoretically injured parties to join such Federal court actions would so increase the cost of bringing such actions and decrease the potential rewards that it might reduce the incentive to sue and thus "seriously impair this important weapon of antitrust enforcement" *(Illinois Brick Co. v Illinois, supra,* at p 745). Defendant contends, and the majority holds, that the policy enunciated by the Supreme Court applies outside the context of a Federal antitrust action and bars State court action by an indirect purchaser against its seller to recover antitrust proceeds recovered by the seller, even though the claim is based upon a contract between the indirect purchaser and the seller.

Clearly, Congress has not preempted the field of antitrust law by passage of the Federal antitrust statutes *(see, Jones v Rath Packing Co.,* 430 US 519, *reh denied* 431 US 925; *Cloverleaf Co. v Patterson,* 315 US 148). A State remains free to regulate in the area of antitrust despite the existence of the Federal antitrust provisions, so long as the State statutes do not conflict with the Federal law. Several States have antitrust laws that provide a remedy for indirect purchasers *(see, e.g.,* Ala Code § 6-5-60 [a]; Cal Business and Professions Code § 16750; Hawaii Rev Stats § 480-14 [c]; Ill Ann Stats, ch 38, § 60-7 [2]; Miss Code Ann § 75-21-9; Wis Stats Ann § 133.18 [1]), but the validity of these statutes remains a matter of debate *(compare, State of California v California & Hawaiian Sugar Co.,* 588 F2d 1270, 1273, *cert denied* 441 US 932, *with Russo & Dubin v Allied Maintenance Corp.,* 95 Misc 2d 344, 347, and *In re Wiring Device Antitrust Litigation,* 498 F Supp 79; *see,* Note, *State Indirect Purchaser Statutes: The Preemptive Power of Illinois Brick,* 62 B U L Rev 1241; Note, *Indirect Purchaser Suits Under State Laws: A Detour Around the Illinois Brick Wall,* 34 Stan L Rev 203; Cavanagh, *The Illinois Brick Dilemma: Is There a Legislative Solution?,* 48 Alb L Rev 273, 309-310). That debate is not before us, however, because plaintiffs' claims are not derived from a right created by statute. Plaintiffs are purchasers pursuant to oral contracts of sale for cost plus 1%, who seek to recover from their seller in common-law actions to recover damages for breach of contract and for money had and received, amounts subsequently received by the seller which reduced the seller's cost for the goods.

I do not believe that the common-law claims of an indirect

purchaser are preempted by Federal antitrust law. The Supreme Court is "generally reluctant to infer pre-emption" *(Exxon Corp. v Governor of Md.,* 437 US 117, 132, *reh denied sub nom. Shell Oil Co. v Governor of Md.,* 439 US 884) in the area of antitrust, even in the face of an arguable conflict. In this case, a finding of preemption requires the inference that the Supreme Court intends the policy it enunciated in *Illinois Brick (supra)* with reference to access to the Federal courts to extend beyond Federal antitrust actions. Such an inference is unjustified. Preemption can be found only if the State action sought to be prohibited is " 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " *(Jones v Rath Packing Co., supra,* at p 526, quoting from *Hines v Davidowitz,* 312 US 52, 67).

In *Illinois Brick (supra),* the Supreme Court was concerned solely with the proper interpretation and application of the Federal antitrust laws and the effect of that interpretation on the Federal courts, including the right of access to those courts to vindicate the rights of indirect purchasers. The court evinced no intention to preempt substantive State laws governing contracts or the traditional common-law remedies for enforcing valid contracts. That an indirect purchaser may not sue a manufacturer for Federal antitrust violations for reasons that relate to access to the Federal courts and diligent enforcement of a specific antitrust statute does not mean that a direct purchaser, who is entitled to bring such a suit, cannot agree to pass on the benefits of that suit to its customers. *Illinois Brick* spoke to the question of who can bring a Federal antitrust claim; it has no bearing on the validity of a contract for the subsequent disposition of the proceeds of such an action.

For the same reasons, *Illinois Brick (supra)* cannot be viewed as establishing a public policy which would prohibit enforcement of the contracts plaintiffs allege. Of course, " '[a] contract which binds one of the parties to do that which is contrary to the policy of the state or nation is void' " *(Matter of Rhinelander,* 290 NY 31, 39, quoting from *Matter of Hughes,* 225 App Div 29, 31, *affd* 251 NY 529), and if Dairylea's alleged promises to remit part or all of the antitrust settlements to plaintiffs are violative of the public policy of the United States, the contracts are illegal and cannot be enforced *(see, Silvera v Safra,* 79 Misc 2d 919; *Klein v Comenzo Co.,* 207 NYS2d 739; *Kaiser-Frazer Corp. v Otis & Co.,* 195 F2d 838, *cert denied* 344 US 856). Although the term

"public policy" is inherently vague and incapable of precise definition, it is generally accepted that for a contract to be void as violative of public policy it must either contravene a statute or some basic principle of common law *(see, Hartford Acc. & Indem. Co. v Village of Hempstead,* 48 NY2d 218, 225; *Straus & Co. v Canadian Pac. Ry. Co.,*254 NY 407) or its performance must in some significant way be injurious to an established public interest *(see, Proctor Troy Props. Co. v Dugan Store,* 191 App Div 685). An otherwise valid agreement should not be set aside on these grounds unless it is clearly repugnant to a strong public policy *(see, e.g., Cheatham v Cheatham,* 93 Misc 2d 576; *Kloberg v Teller,* 103 Misc 641; 21 NY Jur 2d, Contracts, § 145). I see nothing in *Illinois Brick* that establishes a national policy which prohibits the direct purchaser of goods from promising to remit part or all of the proceeds of a Federal antitrust action to its customers simply because those customers were not themselves entitled to bring the antitrust action. Furthermore, I believe it is mistaken policy for the State judiciary to strain to perceive Federal bars to access to State courts in matters involving obligations arising under State common law.

The successful plaintiff in an antitrust action is naturally entitled to put the amount recovered to any lawful purpose it wishes. Patently, it is free to remit all or part of the amount recovered to its customers should it elect to do so, for example, to further good customer relations. I see no reason why it should not similarly be allowed, prior to commencing an antitrust suit that only it is authorized to bring, to contractually bind itself to remit all or part of the proceeds of such a suit to its customers. If plaintiffs' interpretation of the alleged oral agreements is correct, that is in effect what Dairylea has agreed to do. Such a contract is not violative of any preemptive public policy established in *Illinois Brick* (431 US 720, *supra)* Moreover, a State common-law action to enforce such an agreement can in no way serve to unduly complicate a prior Federal antitrust action for the simple reason that it is not a part of that Federal action. In short, to the extent there may exist contracts requiring Dairylea to remit to plaintiffs any portion of the antitrust settlement which constitutes a reduction in the cost of the milk cartons, Federal antitrust policy does not bar an action to recover that amount. *Illinois Brick* simply dealt with the application of the Federal antitrust laws in Federal courts; in no way does it limit or impair contractual rights enforceable by traditional State common-

law actions *(see also, Caraway v Ford Motor Co.,* 148 F Supp 776).

For the same reasons, *Illinois Brick (supra)* would not bar an action for moneys had and received as an alternative to recovery upon the contract *(see, Darmsteadter v Tandberg of Am.,* 104 AD2d 355). Although considered an action at law, a suit for moneys had and received is based upon equitable principles of unjust enrichment *(see, Federal Ins. Co. v Groveland State Bank,* 37 NY2d 252, 258; *Friar v Vanguard Holding Corp.,* 78 AD2d 83, 89). The essential elements of such an action are threefold: the defendant must have received moneys properly belonging to the plaintiff; the defendant must have been benefited thereby; and considerations of justice and good conscience preclude allowing the defendant to retain the moneys *(see generally, Schank v Schuchman,* 212 NY 352, 358-359; 22 NY Jur 2d, Contracts, § 451). Contrary to Dairylea's contention, it is not necessary that the defendant's initial possession of the moneys be wrongful *(Friar v Vanguard Holding Corp., supra,* at p 89; *see, Simonds v Simonds,* 45 NY2d 233, 242; *Baratta v Kozlowski,* 94 AD2d 454, 464). In the instant cases, plaintiffs have alleged all the necessary elements of such actions and Dairylea has not met its burden of showing that plaintiffs cannot make out their cases. Accordingly, Dairylea is not entitled to summary judgment dismissing those claims.

## II

Defendant's further argument is that regardless of *Illinois Brick (supra),* the underlying contracts are void because they are not evidenced by sufficient writings to satisfy the requirements of the Statute of Frauds. As noted, Special Term denied those branches of Dairylea's motions which were for leave to amend its answers not because the delay in asserting the affirmative defense of Statute of Frauds had prejudiced plaintiffs *(see,* CPLR 3025 [b]; *Surlak v Surlak,* 95 AD2d 371; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3025:6, p 477), but rather because it found the defense to be without merit. Dairylea has raised no objection to Special Term's decision to consider the merits of the proposed amendments on its applications for leave to amend. Indeed, in its brief, Dairylea has urged us to consider the merits of the defense. Moreover, since the applications for leave to amend were combined with applications for summary

judgment, Dairylea had a full opportunity to present its proof on the issue. Accordingly, because we agree that Dairylea's Statute of Frauds defense is meritless, we need not determine whether it would prejudice plaintiffs to allow the amendment at this late date (*see, Goldstein v Brogan Cadillac Oldsmobile Corp.*, 90 AD2d 512; *Sharapata v Town of Islip*, 82 AD2d 350, 362, *affd* 56 NY2d 332; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3025:11, p 481).

The oral agreements concededly provide for the sale of packaged milk and milk products by Dairylea to plaintiffs. In dispute is the proper interpretation of that portion of the contracts which required Dairylea to charge its costs plus 1% for the milk cartons it provided to plaintiffs. It is plaintiffs' position that these contractual provisions refer to Dairylea's final cost as reduced by the antitrust proceeds and rebates, whereas Dairylea maintains that these terms are limited to its costs as they appeared to be at the time of delivery. Dairylea contends that if these provisions are interpreted so as to require Dairylea to reimburse plaintiffs for amounts subsequently received by Dairylea which serve to reduce the cost of the cartons, the agreements are violative of both the Statute of Frauds provisions contained in Uniform Commercial Code article 2 (UCC 2-201 [1]) and that of General Obligations Law § 5-701 (a) (1). The Statute of Frauds contained in the Uniform Commercial Code is patently inapplicable to these oral agreements. UCC 2-201 (3) (c) specifically provides that the statute does not serve as a bar to claims concerning goods that have already been delivered and accepted or paid for pursuant to an oral agreement, and the plaintiffs here seek to recover a purported overpayment for goods that have been both delivered and accepted *and* paid for. Hence, this section cannot bar plaintiffs' claims (*see, L. Fatato, Inc. v Decrescente Distrib. Co.*, 86 AD2d 600).

No such ameliorative provision limits the applicability of General Obligations Law § 5-701 (a) (1), the relevant part of which provides that absent sufficient written memoranda an oral agreement is void if it cannot be performed within one year from the making of the contract. Although complete performance by both parties will take a contract out of this statute (*i.e., Dodge v Crandall*, 30 NY 294; 56 NY Jur, Statute of Frauds, §§ 304-305), it is well settled in New York that neither partial performance by both parties nor complete performance by only one party will save an agreement that cannot be performed within a year (*see, e.g., Meyers v Waverly*

*Fabrics,* 65 NY2d 75; *Montgomery v Futuristic Foods,* 66 AD2d 64). The doctrine of partial performance, which may in certain limited situations save a contract involving an interest in realty from the effects of the Statute of Frauds *(see, Anostario v Vicinanzo,* 59 NY2d 662; *Sleeth v Sampson,* 237 NY 69), is inapplicable to actions at law based on a contract that cannot be performed within one year *(Wahl v Barnum,* 116 NY 87, 98; *Zimmerman v Zimmerman,* 86 AD2d 525; 56 NY Jur, Statute of Frauds, § 297; *see,* Whitney, Contracts § 75, at 241 [6th ed]). Thus, if the instant contracts are incapable of performance within a year, they are void and plaintiffs' contract actions must fail.

The criteria for determining whether a contract is within the statute turn not on whether the contract is actually performed within the year, but rather on whether by its express terms or by necessary implication the agreement is one which cannot be performed within a year *(see, e.g., North Shore Bottling Co. v Schmidt & Sons,* 22 NY2d 171, 175-176; *Trustees of First Baptist Church v Brooklyn Fire Ins. Co.,* 19 NY 305, 307; 2 Corbin, Contracts § 444 [1950]; 3 Williston, Contracts § 495 [3d ed]). The statute, moreover, is to be interpreted narrowly and applies only to those contracts "which by their very terms have absolutely no possibility in fact and law of full performance within one year" *(D & N Boening v Kirsch Beverages,* 63 NY2d 449, 454). Thus, if there exists any possibility, however remote, that the contract could be performed within a year, it is not within the statute and may be enforced if otherwise valid *(see, Freedman v Chemical Constr. Corp.,* 43 NY2d 260, 265; *Warner v Texas & Pac. Ry.,* 164 US 418, 434). Nor, if the contract can in some manner be performed within a year, is it relevant that it may also "be capable of an indefinite continuance" *(Trustees of First Baptist Church v Brooklyn Fire Ins. Co., supra,* at p 307).

The contracts at issue here were contracts of indefinite duration which did not provide for termination at some specific time or upon the occurrence of a particular event. Thus, unless they were terminable without a breach and within a year by either party, or at least by Dairylea *(see, North Shore Bottling Co. v Schmidt & Sons, supra,* at p 177, n 3), the law would regard them as incapable of performance within a year and therefore within the Statute of Frauds *(D & N Boening v Kirsch Beverages, supra,* at pp 456-458; *Zupan v Blumberg,* 2 NY2d 547). Plaintiffs, however, have provided affidavits by participants to the oral agreements originally entered into by

the parties who declare unequivocally that the agreements were terminable at will. Dairylea, on the other hand, has sought to counter these evidentiary showings with affidavits by an employee who was not involved in negotiations with any of the plaintiffs until several years after the original agreements were entered into and who merely stated that to the best of his knowledge the agreements were not terminable at will. In the absence of any evidence contradicting plaintiffs' proof that the business relationships between the parties were terminable at will, there can be no merit to this aspect of Dairylea's belated attempt to raise the affirmative defense of Statute of Frauds.

Somewhat more persuasive at first perusal is Dairylea's remaining contention that, even assuming the parties were otherwise free to terminate the contracts at will, if plaintiffs' interpretation of the contracts is correct, Dairylea could never completely perform the contracts because it would always be under a continuing obligation to remit to plaintiffs any amount it might receive at some later date which would reduce the cost of the cartons it had previously sold to plaintiffs. This argument is flawed, however, because it turns the applicable criteria upside down. The test for determining whether a particular contract is within or without the statute is not whether some future event may occur which will render performance impossible within the year, but rather whether the contract by its own terms renders performance within a year impossible. If plaintiffs' interpretation is correct, the contracts at issue simply required Dairylea to charge plaintiffs its cost for the milk cartons, plus 1%. There is nothing inherently impossible in determining the cost of goods within a year. As it happened—if plaintiffs' view of the contracts ultimately prevails—the cost of the milk cartons involved in these cases was subsequently reduced. This was not a necessary result of the terms of the contracts, however, but rather of the unanticipated antitrust recovery.

The contracts did not require Dairylea to purchase the milk cartons under conditions that would render it unable to determine their final cost for several years. Certainly, Dairylea was under an obligation to act in good faith and was required to purchase the goods in a reasonable manner for a fair price (see, 22 NY Jur 2d, Contracts, § 258; see generally, Clark v Fleischmann Vehicle Co., 187 NYS 807). The obligations imposed by such a contract were discussed by the First Department in Title Guar. & Trust Co. v Pam (192 App Div

268, 322, *affd* 232 NY 441, *rearg denied* 233 NY 530), which concluded that "[a] contract to do work upon a basis of cost plus a stipulated commission does not mean that the contractor has the right to expend any amount of money he may see fit upon the work, regardless of the propriety, necessity or honesty of the expenditure, and then compel repayment by the other party, who has confided in his integrity, ability and industry". None of the parties to the actions suggest that this obligation would extend so far as to require Dairylea, assuming it acted reasonably in purchasing the cartons, to subsequently commence an antitrust action in order to decrease the cost of the goods. Rather, plaintiffs' contention is that having voluntarily acted to obtain the antitrust funds, Dairylea then became obligated to remit to plaintiffs that portion of the money attributable to cartons sold to plaintiffs. Dairylea may not transform a contract which could have been completely performed within a year into one incapable of performance within a year by unilateral actions not specifically required by the contracts but which may have the effect of resurrecting otherwise defunct contractual obligations. Indeed, even had the contracts required Dairylea to seek to reduce its costs by an antitrust action against the carton manufacturers, the contracts would nonetheless be outside the statute since it is not impossible—even if it is unlikely—that such a claim could be resolved within the year.

We emphasize that these contracts did not subject Dairylea to a continuing negative covenant which it would never be able to completely perform *(see, Meyers v Waverly Fabrics,* 65 NY2d 75, *supra; Polykoff Adv. v Houbigant, Inc.,* 43 NY2d 921).* Instead, Dairylea's obligation was terminable as soon as it delivered the goods and accurately determined its cost. Nor are these contracts analogous to those requiring an employer to pay an employee commissions on all sales to customers originally obtained by the employee even with respect to sales made after the employment relationship terminates, for in those cases the employer is not free to simply refuse to accept such future sale orders, and thus the termination of its obligations is subject to the whims of third parties *(see, Zupan v Blumberg,* 2 NY2d 547, 552, n, *supra; Nat Nal Serv. Stas. v Wolf,* 304 NY 332). In the instant cases, if plaintiffs' interpretation of the agreements is accepted, Dairylea was unable to completely perform within the year only because it voluntarily brought an antitrust claim and thus purportedly became unable to determine its costs until it received the antitrust

settlement. This time span was not a necessary result of any contractual obligations, however, and did not render the contracts incapable of performance within a year by their own terms. Indeed, Dairylea's argument would place almost every oral contract within the statute, since there always exists the possibility that some events will render performance within the year impossible and thus subject a party to a continuing obligation.

Since the oral agreements at issue here were susceptible of performance within a year, they are not subject to General Obligations Law § 5-701 (a) (1). Accordingly, Special Term acted properly in denying Dairylea's applications for leave to amend its answers to include the affirmative defense of the Statute of Frauds. Because the contract actions are not barred by Federal antitrust policy, however, Special Term erred in granting Dairylea summary judgment dismissing plaintiffs' claims to a part of the antitrust settlement.

## III

Finally, I conclude that plaintiffs are not entitled to partial summary judgment on any of their causes of action. Although the parties agree that they entered into contracts under which Dairylea was to provide the plaintiffs with milk cartons at cost plus 1%, they disagree sharply as to whether the term "cost" referred to Dairylea's "cost" at the time of sale or whether it required Dairylea to ascertain its final "cost" by deducting any amounts subsequently received by Dairylea and which were attributable to the purchase of the cartons it sold to plaintiffs. Nowhere in their affidavits in support of their cross motions for partial summary judgments do the affiants declare that the question of reimbursement for subsequent reductions in cost was specifically discussed during the contract negotiations or expressly provided for in the agreements. Rather, it is plaintiffs' position that such an interpretation is implicit in the agreements and is sustained by the custom and usage of the industry. Therefore, a plenary trial will be necessary to determine whether in fact the interpretation is implicit, whether there existed such a custom and usage in the industry when these contracts were negotiated, and, with respect to the claims to a portion of the antitrust settlement, whether that custom and usage is broad enough to encompass so unusual an event as a subsequent antitrust recovery. Thus, plaintiffs' cross motions were properly denied.

BRACKEN and EIBER, JJ., concur with RUBIN, J.; LAZER, J. P., concurs in part and dissents in part, and votes to modify the orders appealed from, by denying those branches of defendant's motions which sought summary judgment dismissing so much of the complaint in action No. 1 as demands a share of proceeds received by defendant in settlement of an antitrust suit, and summary judgment dismissing the complaints in actions Nos. 2 and 3 in their entirety, with an opinion.

Three orders of the Supreme Court, Queens County, each dated March 12, 1983, affirmed, without costs or disbursements.