Beard v Chase (2018 NY Slip Op 04636)





Beard v Chase


2018 NY Slip Op 04636


Decided on June 21, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 21, 2018

Renwick, J.P., Richter, Tom, Gesmer, Oing, JJ.


5573 651504/15

[*1]Peter Beard, et al., Plaintiffs-Respondents,
v
Bernie Chase, et al., Defendants-Appellants.


Davidoff Hutcher & Citron LLP, New York (Joshua S. Krakowsky of counsel), for appellants.
Grossman LLP, New York (Judd B. Grossman of counsel), for respondents.



Order, Supreme Court, New York County (Charles E. Ramos, J.), entered June 23, 2017, which granted plaintiffs' motion for partial summary judgment on their causes of action for a declaration, conversion, and replevin, and declared that plaintiff Peter Beard is the sole owner of the subject art work, is affirmed, without costs.
The motion court correctly found that the works of art at issue were goods, and thus that the purported oral agreement to sell them was barred by the statute of frauds (see UCC 2-201; American-European Art Assoc. v Trend Galleries, 227 AD2d 170 [1st Dept 1996); compare National Historic Shrines Found., Inc. v Dali, 1967 WL 8937 [Sup Ct, NY County 1967]). Defendants' wire transfers to a third party, who then purportedly remitted the funds to plaintiffs, were not unequivocally referable to the agreement alleged, such as to deem the agreement partially completed and outside the statute of frauds (see Anostario v Vicinanzo, 59 NY2d 662, 664 [1983]). Alternative explanations, including that the funds were for financing other projects involving the third party, defeat such claims (see Baytree Assoc. v Forster, 240 AD2d 305, 307 [1st Dept 1997], lv denied 90 NY2d 810 [1997]).
Defendants' argument that the transcripts of plaintiff Beard's testimony should not have been considered, since the deposition was not yet concluded, is academic, given that plaintiffs met their burden as movants to show that there was no written contract between the parties with affidavits, and without the transcripts (compare Stern v Inwood Town House, 22 AD2d 650 [1st Dept 1964]). Plaintiffs were not required, as movants, to disprove any possible defenses defendants might assert in opposition to their motion, such as partial performance (see C.H. Sanders Constr. Co. v Bankers Tr. Co., 123 AD2d 251, 252 [1st Dept 1986]).
We have considered defendants' remaining contentions and find them unavailing.
All concur except Richter and Tom, JJ.
who dissent in a memorandum by Tom, J.
as follows:




TOM, J. (dissenting)


In this dispute over three works of art by plaintiff Peter Beard, defendants raised issues of fact as to whether the parties' oral agreement to sell the works was completed, or at least partially performed, thus removing the agreement from the requirements of the statute of frauds (see Baje Realty Corp. v Cutler, 284 AD2d 282, 283 [1st Dept 2001]; Sands v Feldman, 243 AD2d 294 [1st Dept 1997]; Guterman v RGA Accessories, 196 AD2d 785 [1st Dept 1993]). Accordingly, I dissent and would reverse Supreme Court's grant of partial summary judgment to plaintiffs.
Plaintiff Peter Beard is a renowned artist, whose signature works are photo collages, often featuring African landscapes and animals, including elephants. Plaintiff Peter Beard Studio LLC (the Studio) was created to "protect and provide a market for" Beard's works and is authorized to sell Beard's original artwork when it is being sold for the first time. Beard's wife, nonparty [*2]Nejma Beard (Nejma), is the president of the Studio and Beard's authorized agent. Defendant Bernie Chase is an art collector who has amassed a considerable collection of Beard's artwork over the years, and an investor in defendant art gallery Phillippe Hoerle-Guggenheim. The three pieces of artwork at issue in this case are entitled "The Snows of Kilimanjaro," "765 Elephants," and "Paradise Lost" (the Works).
In or around October 2013, Beard's longtime friend and occasional artistic collaborator, nonparty Natalie White, introduced him to Chase. At that time, Beard participated in two photo shoots in New York City that were organized by Chase and his friends and that Chase agreed to substantially fund. The shoots involved numerous well known models who would be photographed, and Beard would then work the photographs into his signature collages. Among others, Chase and White attended the shoots. Following the shoots, Beard "hand-worked" the photographs in a room paid for by Chase at the Soho Grand Hotel.
During the same time period, Beard also created original works from earlier photographs, including the Works. While Chase contends he reached an agreement with Beard to purchase the Works, Beard maintains that he never entered into such an agreement. Instead, Beard alleges that after he created the Works at White's Manhattan apartment, the Works were taken without his permission or consent.
Beard further alleges that he did not know where the Works were located until he learned of their display by the Hoerle-Guggenheim gallery in February 2015. Plaintiffs' counsel immediately demanded the return of the Works and sought to resolve the matter. However, plaintiffs later learned that defendants were actively marketing the Works for sale.[FN1]
In May 2015, plaintiffs commenced this action seeking a declaratory judgment and asserting claims for conversion, replevin and tortious interference with economic advantage.
In an affidavit in support of plaintiffs' motion for summary judgment, Beard did not dispute that Chase organized the October 2013 photo shoots or that he substantially funded them. He also agreed that he created the Works during that time, including working on them at White's apartment in front of Chase, among others. He again claimed that the Works were taken from the apartment without his consent or permission. He also averred that he never agreed to sell the Works and that he did not authorize anyone (other than the Studio) to sell the Works. He added that he was not compensated for the Works.
In contrast to his affidavit, at his partially completed deposition,[FN2] Beard testified that the Works had not actually been completed. While he did not think he ever agreed to selling his work to Chase, it was possible that they had discussed it. He denied that White told him that she was selling the Works on his behalf to Chase. In any event, he insisted he was not compensated for the Works.
Although he didn't recall the circumstances, Beard agreed that he had signed an affidavit in connection with this suit, but stated that he had not read it before signing it, observing that it was "just words. Unbelievable," "in a huge area of bulls**t." He went to the deposition because he was told he had to go, but the deposition was simply wasting everyone's time. Inconsistent with his position in this action, Beard stated that he had no objections to Chase selling the [*3]Works.
Beard agreed he was sick in 2013 and had a stroke, but he did not know whether he experienced any confusional episodes. Yet, he did experience confusional episodes and memory loss at the time of a giant Polaroid shoot at which he met Chase. He denied having been hospitalized for a dangerous amount of drugs in his system, although he "[p]ossibly [had] a little, but not much," "[m]arijuanna," and it "could have been [cocaine]."
In her affidavit in support of the motion, Nejma Beard stated that the Studio, which she runs, is the sole entity authorized to sell Beard's work. In that role, the Studio maintains an archive of his artwork, photographs each new work, and marks each work with a special ink stamp to prevent and deter counterfeits. She explained that at no time did the Studio agree to sell the Works. She further explained how she came to learn of the display of the Works and about defendants marketing the Works for sale, and her concerns about the impact it could have on the market for Beard's work.
At her deposition, Nejma also testified that she and her husband commenced this lawsuit because Bernie Chase was a "pathological liar" and a "parasite" who was trying to steal from her husband. She also believed that White and Elizabeth Fekkai, Beard's friend, were involved in the scheme. She first learned about the Works' existence by a Google alert that linked her to an article about the Hoerle-Guggenheim Gallery offering the Works for sale. When she asked Beard about the Works, he said that they were his, adding, "[H]ow the hell did they get there [the Hoerle-Guggenheim]?" Nejma noted that Beard was also diagnosed in 2013 with bipolar disorder after she had him sent to the hospital.
In their "statement of undisputed facts," plaintiffs' acknowledged defendants' claim that Chase purchased the Works in two separate "handshake" deals with Beard, but stressed Beard's poor health at the time.
Plaintiffs argued that summary judgment should be granted because of the absence of a written agreement that identified the parties, the purchase price and other material terms and that was signed by Beard or an authorized agent. They contended that the purported agreements did not fall within any of the exceptions to the statute of frauds. They also argued that defendants failed to establish that the contract was completed.
In opposition, Chase submitted an affidavit and deposition testimony in which he explained that White was Beard's associate and initially informed him that he could purchase some of the final works from the model photo shoots. When Chase and Beard met in October 2013, they "hit it off," and when Chase told Beard of his interest in his work, Beard replied that he would be happy to create some new works for him.
A week later, at White's apartment, Chase bought two works in progress. According to Chase, he and Beard reached an agreement, alone in White's bedroom, whereby he would pay $50,000 for Snows of Kilimanjaro and $30,000 for 765 Elephants. The two then returned to the living room and informed White of the agreement, shaking hands in front of her and several others. Beard finished the Works while staying at the Soho Grand Hotel. Chase asserted that he was present when Beard worked on the pieces and that he "help[ed] in the artistic process," making suggestions, which he and Beard would discuss. Chase then took possession of the Works from White's apartment, where they had been taken after leaving the Soho Grand, from October to December of 2013.
Beard told Chase that he should pay the purchase price directly to White. Because Beard wanted an assistant to help him create the pieces, Chase paid Eva Bastianon, an artist and White's roommate, $11,000 in cash to do so. Chase also purchased Bastianon a diamond bracelet. Beard and Bastianon then worked on the pieces at White's apartment between October 18 and 23 of 2013.
Then, on October 25, 2013, Chase wired $50,000 to White, which is reflected in an annexed wire transfer confirmation. Before the two photo shoots, which took place on October 28 and 29, 2013, Chase took possession of 765 Elephants and Snows of Kilimanjaro. On October 28, 2013, Chase saw White hand Beard an envelope that she said contained $10,000 in cash.
At some point between the two shoots, Beard told Chase he had another work for him and [*4]showed him a photograph that would become the centerpiece to Paradise Lost. The two agreed that Chase would pay $40,000 for that piece. Beard directed Chase to pay $20,000 to White, $10,000 to Beard, and $10,000 to Ingrid Levin, Beard's girlfriend, to pay for surgery. Chase states that he gave Beard and Levin those sums in front of a number of witnesses.
On November 15, 2013, Chase wired another $50,000 to White, which is reflected in a wire transfer confirmation. According to Chase, that was the balance of what he owed for the Works.
After the second photo shoot, which took place on November 18 and 19, 2013, Beard needed a place to work on the Polaroids, some of which Chase had purchased separately, and on the Works. Apparently, White did not want Beard to use her apartment for the Works, and Beard asked Chase to pay for a room in the Soho Grand Hotel, to which he agreed. In this regard, Chase attached credit card statements and bills from the Soho Grand reflecting that he paid a total of $83,782.61 for rooms and related charges between October and December 2013.
Chase further noted that sometime after the second photo shoot, he asked Beard to work on Paradise Lost as discussed. He also asked Beard to do additional work on 765 Elephants. Beard then worked on those pieces at the Soho Grand; Chase attached photographs he took on his iPhone of Beard working on 765 Elephants and Paradise Lost on November 22, 2013.
In early December 2013, Beard wanted to work in White's apartment, and had Paradise Lost transported there. When the piece was completed Chase accepted it from Beard at White's apartment. Beard and Chase continued to work on other pieces at the Soho Grand through December 2013.
Chase had Beard sign the backs of the pieces to authenticate them. He rejected the claim that any of the Works were stolen, and reiterated that Beard created the pieces specifically for him and that Chase was involved in the artistic process. Chase stressed that he paid $100,000 to White, $11,000 to Beard's assistant, $10,000 to Beard, and $10,000 to Levin at Beard's direction. He also paid for the hotel, food, art supplies, and miscellaneous expenses.
At his deposition, while Chase testified that he wired money to White, he could not say which wire transfer record was for the Works, since he was also wiring White money as a purchaser of pieces created in the giant Polaroid shoot White had arranged. However, Chase also stated that he "ha[d] on [his] books" that the wire transfers on October 25 and November 15, 2013, were for the Works. He also could not say whether he or a company he owned actually paid the transfers, but maintained that it did not matter, because he was the ultimate owner, no matter who paid for them.
Chase conceded that he also spent around $110,000 in connection with the two photo shoots, and that he bought four pieces from that shoot out of around 100 that were made. He also admitted that he did not have a written agreement from Beard concerning their deal regarding the first two pieces, other than Beard signing the back of the pieces. Nor did he have a written agreement regarding the third piece.
Chase also denied that Beard was impaired at the time of the agreements. In that regard, he stated that at all relevant times Beard appeared lucid, coherent, and in command of his faculties, and that Beard's rational mental state is best demonstrated by the outstanding works he created at that time.
Chase believed that Beard was being forced to "lie" by his wife Nejma. Relatedly, he understood that Nejma had a documented history of asserting legal claims against persons who own Beard's work "in an attempt to improperly control the market for Peter Beard works, as well as attempt to control Peter Beard's life and finances."[FN3]
In her affidavit, Natalie White stated that Beard, who was her longtime friend and who she sometimes assisted, complained to her that "other people" controlled his finances, and he enlisted her help in selling additional artwork so he could generate income without the involvement or interference of other parties. At her deposition, she clarified that she meant that Beard wanted to make money without Nejma having access to it. When a piece of his art was sold, the purchaser would pay White, and then she would use it to pay his various personal expenses. She would receive a 15% to 20% "commission" "on works that [she] sold for him."
In the fall of 2013, White was working with Beard on the giant Polaroid shoots, with plans for him to turn the photographs into his signature photo-collages. The expense of the shoots was significant, and both she and Chase provided financing [FN4]. During the same time period, she spoke with Beard about Chase purchasing some of his works, and the two men met at her apartment. After speaking privately in her bedroom, the men told her that Beard had agreed to sell Chase two works for $80,000. She would be given the money by Chase, and would then give it to Beard by paying his expenses as he needed.
That same month, she gave Chase a handwritten receipt "memorializ[ing]" the transaction. The receipt, dated October 23, 2013, was attached to her affidavit, and indicated the above terms, although it also stated that Chase was to pay her $10,000 a month until paid in full. White also confirmed that Beard and Chase entered into a separate agreement to purchase Paradise Lost for $20,000. Accordingly, at some later point when Chase asked her for a receipt for all three pieces, she prepared a handwritten memorandum stating that Chase purchased all three pieces for $100,000, which he had paid in full.
White averred that Chase wired her a total of $100,000, as reflected in her attached bank statements. She stated that from that total she took a $15,000 commission, paid $15,000 to Elizabeth Fekkai, an art dealer who assisted Beard, and paid the balance to Beard. She explained that she paid out the money to Beard in small installments, sometimes of only several hundred dollars in cash. As examples, she pointed to withdrawals of $1,000, $800, and $500 on three days in October 2013, as well as other similar withdrawals and larger withdrawals up to $9,000 continuing into November and December 2013, which were reflected in her attached bank statements.
In addition, at Beard's direction, White wired $2,900 to Ingrid Levin, as reflected in her bank statements. She also paid various tabs for meals and events, as reflected in her statements. White also paid $26,700 to Dr. Steven M. Butensky, DDS, to pay for Beard's new upper teeth. White kept a ledger of all such payments, which she no longer had, because she had given it to Beard at his request.
White also confirmed that the two unfinished pieces were brought to her apartment and that her roommate Eva Bastianon assisted Beard in creating the Works. She also noted that Chase paid for Beard's room in the Soho Grand. She denied that the Works were stolen or that Beard was not compensated for them. She also denied that Beard was impaired at the times of the agreements, and noted he was lucid, coherent, and in command of his faculties during that [*5]time period.
At her deposition, White noted that Beard had been hospitalized at some point during this time period. White could not distinguish on her bank statement between deposits representing money given to her by Chase for the Polaroid shoots and money given to her by Chase for the purchase of the Works. White stated that "[i]t didn't really matter," since she knew the total amount due for each transaction, and Chase had paid all sums due.
White described assisting Beard with the sale of other pieces in 2009, and explained that she similarly took a commission and worked with Fekkai, and that she and Fekkai gave Beard money in installments.
Eva Bastianon stated in her affidavit that she assisted Beard in creating the pieces at issue and that Chase was often present during the work. She also assisted Beard with the photo shoots. She also noted that some of the work was completed in the apartment she shared with White and that some of the work was done in the Soho Grand Hotel. Bastianon attached photographs showing Beard, Chase and herself with the Works, both at her apartment and at the hotel.
Bastianon corroborated that Chase paid her to work on the Works, and bought her a diamond bracelet, and that she observed White give $10,000 in cash to Beard during the work; White and Beard told her the money was for the Works. She also saw White give Beard cash on many other occasions. Throughout the artistic process, while Beard would reject Chase's ideas for how to complete the Works, he would acknowledge that the Works were for Chase. Bastianon thus knew that Beard was aware he was creating the Works for Chase. She also denied any claim that the Works were stolen.
After noting that during that time period she was working closely with Beard often in 12-hour shifts and for seven days a week, Bastianon remarked that at no time was Beard under the influence of alcohol or drugs and that he appeared to be lucid and competent at all times. At her deposition, Bastianon noted that Beard's stroke had not taken place until around Thanksgiving of 2013, well after the agreements between Beard and Chase had been made.
Fekkai testified that when Beard told her that he had sold the first two works to Chase, she told him that the amount was too low, and tried to stop the deal. However, Beard told her that he had shaken hands and the pieces were Chase's. At that time, Beard was sober and lucid.
Fekkai also learned that Beard sold a third piece to Chase for $20,000 or $40,000. During the photo shoots, she visited Beard nearly every day, and he never appeared incapacitated. She also observed White give Beard cash whenever he needed money. Fekkai also denied that the Works were stolen or that Beard was impaired at the time of the agreements.
She had no personal knowledge of the sales or their terms. She paid for dental work for Beard in the amount of $26,700, because she was his friend, and after that White reimbursed her with funds out of the sale to Chase. She had opened a special savings account in which she held Beard's money.
Based on the foregoing evidence, defendants argued that the statute of frauds was inapplicable because the agreement was completed. In the alternative, they argued that there was an issue of fact regarding partial performance. They also argued that the contract was one for services, and thus fell outside the scope of the statute of frauds.
Plaintiffs met their prima facie burden by demonstrating that there was no written agreement for the sale of the Works, valued at over $500, signed by Beard (see UCC 2-201). In this regard, while the handwritten receipts provided by White may constitute some evidence of oral agreement, they were insufficient to constitute written agreements. Indeed, they were not signed by Beard, and it is unclear that they reference the Works, since they do not refer to "The Snows of Kilimanjaro," "765 Elephants," and "Paradise Lost." Rather, they reference "1 elephant kilo, I elephant herd, 1 elephant." Nor do these receipts clearly identify the parties to the transaction, the time frame for payment, or the correct total amount owed (see MP Innovations, Inc. v Atlantic Horizon Intl., Inc., 72 AD3d 571, 572 [1st Dept 2010]).
In addition, although there were conflicts between Beard's affidavit and deposition testimony, he did not have knowledge of an agreement, and denied that he was paid for the Works. He also denied consenting to White selling the Works on his behalf.
It is well settled that paintings are goods governed by the UCC and subject to its statute of [*6]frauds, and thus this purported agreement cannot be considered one for services (see American-European Art Assoc. v Trend Galleries, 227 AD2d 170 [1st Dept 1996]; Rosenfeld v Basquiat, 78 F3d 84, 93 [2d Cir 1996]).
However, the evidence submitted by defendants raised an issue of fact as to whether the oral agreement had been completed or at least partially performed, thereby removing the agreement from the requirements of the statute of frauds. In particular, Chase testified that he agreed to pay $120,000 for the works, which were specifically made for him by Beard, and that he wired $100,000 to White at Beard's direction. Chase also paid $10,000 in cash directly to Beard, $10,000 to Levin at Beard's direction, and $11,000 to Bastianon to work as Beard's assistant. Chase also explained that the deal was done this way specifically because Beard wanted to keep Nejma from knowing about it. Chase's testimony was corroborated by wire transfer statements and by hotel receipts showing that he also paid for rooms where Beard could finish the Works at the Soho Grand Hotel.
White also explained that she often worked with Beard to sell his work so he could generate income without the involvement or interference of other parties, especially Nejma. As is alleged to have occurred here, White stated that when a piece of his art was sold, the purchaser would pay White, and then she would use it to pay Beard's various personal expenses. In this case, she corroborated that Chase wired her $100,000 for the Works, and she paid Beard's various expenses, made other payments at his direction, and gave him cash periodically. Critically, she denied that the Works were stolen or that Beard was not paid for them.
Bastianon also confirmed that Chase paid her to work on the Works, and bought her a diamond bracelet, that she observed White give $10,000 in cash to Beard during the work, and further that White and Beard told her the money was for the Works. She also saw White give Beard cash on many other occasions. Bastianon also observed Beard and Chase working on the Works and Beard's acknowledgment that the Works were for Chase. Similarly, Fekkai testified that Beard told her he agreed to sell the Works to Chase, and that he observed White give cash to Beard whenever he needed funds.
All of the defense witnesses denied that the Works were stolen and denied that Beard was impaired at the time of the agreements or during the time of the photo shoots.
Full performance by both sides removes the contract from the statute of frauds (see Guterman v RGA Accessories, 196 AD2d 785, 785-786 [1st Dept 1993]; Tip Top Farms v. Dairylea Coop., 114 AD2d 12, 32 [2d Dept 1985] ["complete performance by both parties will take a contract out of this statute"], affd 69 NY2d 625 [1986], cert denied 481 US 1029 [1987]). As this Court remarked long ago, "It is difficult to see how the Statute of Frauds can be availed of to set aside a completed transaction" (De Heirapolis v Reilly, 44 App Div 22, 24 [1st Dept 1899], affd 168 NY 585 [1901]).
Stated differently, "The Statute of Frauds applies only to executory, and not to executed, agreements. Hence, when an oral contract has been fully performed by both parties, according to its terms, the Statute of Frauds no longer affects it" (61 NY Jur 2d Frauds, Statute of § 256). Further, UCC 2—201(3)(c) provides that the statute does not serve as a bar to claims concerning goods that have already been delivered and accepted or paid for pursuant to an oral agreement, and defendants have submitted evidence that the Works have been both delivered and accepted and paid for.
Specifically, defendants raised an issue of fact as to whether Chase fully performed the contract by paying the entire amount due to White, Beard, Levin and Bastianon, and whether Beard fully performed by consenting to Chase taking the Works upon their completion. Indeed, in contrast to plaintiff's unsubstantiated statements, defendants presented evidence from multiple witnesses and corroboration from documentary evidence. It is therefore my opinion that the substantial evidence of a fully performed agreement submitted by defendants warrants a trial.
In the alternative, defendants raised issues of fact as to whether defendants' partial performance was "unequivocally referable" to the agreement (see Anostario v Vicinanzo, 59 NY2d 662, 664 [1983]; Baje Realty Corp., 284 AD2d at 283 [finding issues of fact as to whether defendants' partial performance was "unequivocally referable" to the agreement]; H.P.P. Ice Rink v New York Islanders, 251 AD2d 249, 249 [1st Dept 1998] ["Review of the record reveals [*7]that there are triable questions of fact as to whether defendant's remittance to plaintiff of a check for $22,000 and its involvement in meetings regarding the construction of the subject ice rinks, as well as its assisting plaintiff to finance the rinks, constituted partial performance unequivocally referable' to the oral partnership agreement alleged by plaintiff, and, as such, sufficient to take the alleged agreement out of the Statute of Frauds"]).
In particular, the testimony by Chase and White raised issues of fact as to why Chase made the payments as described and why the Works were created in the first place. While it may not be absolutely certain that particular payments were made in connection with the purported oral agreement, it cannot be said that they were definitely not made in connection with it.
Further, to the extent there may have been a lack of clarity by both Chase and White as to which wire transfers were for the Works, and why Chase's company made the transfers on his behalf, this is all the more reason that a trial is warranted. In any event, Chase consistently pointed to the transfers on October 25, 2013 and November 15, 2013 as relating to this agreement.
Moreover, as to the alternative explanations that some of these payments were for financing the photo shoots or to purchase Beard's other works, these should not be grounds to find that the payments were definitively not referable to the oral agreements and to award summary judgment to plaintiffs. To the contrary, they demonstrate why a trial is warranted. Nor should plaintiffs be granted summary judgment because Chase made the payments to White and not directly to Beard, since the evidence showed that that arrangement was at Beard's direction.
There is yet another reason why the conflicting evidence in this record dictates against granting plaintiffs summary judgment, to wit, the principle of equitable estoppel. A trier of fact could conclude that it would be inequitable to permit Beard to avoid the parties' oral contract based on the evidence of full or partial performance in the record. Notably, "the equity doctrine is designed to prevent a party from inducing full or partial performance from another and then claiming the sanctuary of the statute of frauds" (Eujoy Realty Corp. v Van Wagner Communications, LLC, 22 NY3d 413, 426 [2013], citing Messner Vetere Berger McNamee Schmetterer Euro RSCG v Aegis Group, 93 NY2d 229 [1999]). In this case, defendants have presented evidence that a jury could find establishes that an oral agreement was reached by the parties and that Chase was induced by the agreement to pay $120,000 for the Works.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 21, 2018
CLERK



Footnotes

Footnote 1:765 Elephants was sold to a nonparty on or about February 7, 2015 for $185,000 and is no longer in the possession or control of defendants.

Footnote 2:Beard was sick in the fall of 2013 and had a stroke in November 2013 for which he was hospitalized. He may have suffered from confusing episodes during that time. He also had a history of drug use, and blood work taken in the hospital may have found narcotic substances in his system. After he appeared for his deposition in August 2015, his attorneys advised defendants' counsel in October 2015 that due to his health Beard could not continue his deposition. 

Footnote 3:Attached to the opposition papers was a February 24, 2013 New York Magazine article by Robert Kolker in which Nejma is described as trying to control the market for Beard's work "for financial and legacy reasons" and as making efforts to "claw back" some of the works Beard has given away over the years. One friend accused Nejma of "trying to control the purse strings and keep [Beard] on a short leash." The article also describes Beard's long history of being part of the international art and party scene and his habit of giving away his works, including, in one instance, to a mailman. Sources note that Nejma did not like this habit, and she began preventing the sale of his work, and ended relationships with two galleries in order to better control the market. One source noted that Beard "made a lot of transactions that were not in his best interest at times when he did not have money, and probably a lot of those transactions were done without documentation."

Footnote 4:The Polaroid shoots cost her over $100,000, and she would ultimately sue Beard over them.